Aaron Bin-Nun and Sime Bin-Nun v. Commissioner.
Bin-Nun v. Commissioner
Docket No. 745-65.
United States Tax Court
T.C. Memo 1966-197; 1966 Tax Ct. Memo LEXIS 87; 25 T.C.M. (CCH) 1013; T.C.M. (RIA) 66197; September 8, 1966
*87 Petitioner, a broker, had a written agreement with the executors of an estate that if he secured purchasers for and a sale was completed of shares of stock held by the estate, his commission would be 5 percent of the total purchase price of the shares. Upon the facts, held: That the total purchase price of the shares was $760,000 and petitioner's commission was $38,000; that in 1960, petitioner earned $38,000 and the estate was obligated to pay the entire amount thereof; that as between himself and the executors, petitioner did not waive, and they were not relieved from the obligation of paying him, $25,000 of the total commission; and that petitioner earned and received in 1960 the entire commission of $38,000, including the $25,000. Leonard Jay Reade, for the petitioners. John B. Murray, Jr., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined a deficiency in income tax for the year 1960 in the amount of $9,138.38. The question is whether or not the petitioner realized a broker's commission in 1960 in the full amount of $38,000, which is includible in full in his taxable income for 1960. Findings *88 of Fact The stipulated facts are found as stipulated and are incorporated herein by reference. The petitioners filed a joint return with the district director of internal revenue in Brooklyn, New York. They reported income for the calendar year on a cash basis. Aaron Bin-Nun is referred to herein as the petitioner. The petitioner is a real estate broker, licensed in the State of New York at all times material. The Roberts-Rose Textile Co., Inc. was a corporation, organized in 1924, which had its offices in New York City and was engaged in a nation-wide business of selling at wholesale hosiery, laces, toys, and a variety of such merchandise, called "soft" goods. Bernard Rose was the "owner" of the corporation. He owned all of the shares of stock. His attorney was Ira Belfer. In 1958, Belfer told petitioner that he had a client who wanted to sell his "business". There was not any clear indication about the manner in which the business would be sold, whether through a sale of assets or a sale of the corporate stock. The Roberts-Rose Textile Corporation was "the business" to be sold. The petitioner was engaged by Belfer to undertake the work of finding a purchaser, or purchasers, *89 for the business. During the lifetime of Rose, petitioner began that work. Rose died in 1959. Belfer then became the attorney for the estate of Bernard Rose, deceased, and he was also one of the executors of the estate. Upon the death of Rose, Belfer, as an executor, undertook to sell the business of Roberts-Rose Textile Co., hereinafter called Rose Company, as soon as possible. Belfer, as an executor of the estate, continued to retain petitioner's services. On December 9, 1959, a letter-agreement was entered into by petitioner with the estate. The agreement is in the form of a letter from petitioner to the estate, and is as follows, in material part: As an inducement to you to enter into negotiations with Messrs. Fishel Feldman and Leon Spitz for the purchase by them of all of the capital stock of ROBERTS-ROSE TEXTILE CO., INC., the undersigned warrants and represents that he is the sole broker in any way instrumental in interesting the prospective purchaser in the purchase of the said stock and that he is the sole procuring cause of any such purchase. As a further inducement to you to enter into such negotiations the undersigned agrees that the commission to be paid herein *90 in the event that a sale of the said stock results from such negotiations will be the sum equal to five (5%) per cent of the total purchase price for the said capital stock but that no commission shall be, or shall be deemed to be due, earned or payable unless and until a contract for the purchase of the said capital stock shall be executed and delivered by and between you as Seller and Messrs. Fishel Feldman and Leon Spitz as Purchasers, and unless and until the said transaction shall be consummated by delivery of title to the said stock in accordance with the terms of the agreement and by the full payment of the purchase price. It is further understood and agreed that if for any reason whatsoever a contract shall not be entered into between you and the said Messrs. Feldman and Spitz, or a contract having been entered into, such contract, for any reason whatsoever, including but not limited to, the failure or refusal to perform the said contract by either the Seller or Purchasers, shall not be consummated and title shall not be conveyed to Purchaser, and the purchase price shall not be paid, then said commission shall not be due, earned or payable to the undersigned who shall not *91 have and hereby releases any claims whatsoever against you or your executors, trustees or representatives for commission or other compensation in connection with this transaction. In determining the purchase price on the basis of which my commission is to be computed there shall be included the fixed assets, inventory, cash and accounts receivable of ROBERTS-ROSE TEXTILE CO. INC., less its liabilities as the same shall be constituted prior to the actual sale, plus all sums paid by the Purchaser for good will. It is the intention of the parties that any arrangements made between the Purchaser and Sellers relating to cash and accounts receivable, that I shall be entitled to my commission on those items as well as the other elements of the purchase price. Petitioner was successful in securing 3 individuals who agreed to arrange for the purchase of the stock of Rose Company, namely, Fishel Feldman, Leon Spitz, and Avram Feldman, and they formed a corporation for that purpose. They are referred to hereafter as Feldman, Spitz, and Feldman. On December 22, 1959, an agreement was entered into by petitioner and the prospective purchasers of the stock of the Rose Company, Feldman, Spitz, *92 and Feldman. This agreement provided as follows, in material part: WHEREAS BIN-NUN has offered to the Proposed Purchasers a proposal for the acquisition of all of the issued and outstanding shares of capital stock of ROBERTS-ROSE TEXTILE CO. INC., which shares of stock are owned by IRA M. BELFER, CHEMICAL BANK NEW YORK TRUST COMPANY and CHARLES ROSE, as Executors under the Last Will and Testament of BERNARD ROSE, deceased; and WHEREAS the Proposed Purchasers while expressing interest in the proposed transaction are unwilling to acquire the shares of capital stock of ROBERTS-ROSE TEXTILE CO. INC. on the terms and conditions offered, but are willing to enter into a joint venture with BIN-NUN for the acquisition of stock, upon the terms and conditions hereinafter set forth; NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS: 1. BIN-NUN and the proposed Purchasers do hereby agree to enter into a joint venture for the acquisition of all of the issued and outstanding shares of capital stock of ROBERTS-ROSE TEXTILE CO. INC., on such terms and conditions as shall be approved by the Proposed Purchasers. 2. In order to induce the Proposed Purchasers to enter into said negotiations and *93 to purchase the said shares of capital stock, BIN-NUN does hereby waive any and all claims that he may have to a brokerage commission arising out of any such transaction over and above the sum of $13,000.00. It is intended by the parties hereto that in the event a transaction is consummated under the provisions of which BIN-NUN is to receive a brokerage commission, then, and in such event, the joint venture shall receive the benefit of such brokerage commission to the extent that the same exceeds the sum of $13,000.00. 3. In consideration of the foregoing, the parties agree that BIN-NUN's participation in the corporation which shall hereafter be formed to acquire the said shares of stock of ROBERTS-ROSE TEXTILE CO. INC. shall be five (5%) per cent of the capital stock thereof. 4. The shares of stock to be issued to BIN-NUN in accordance with the foregoing paragraph shall be subordinate to the shares of stock which are owned by the persons who have paid cash therefor in the following respects: (a) BIN-NUN shall not have the right to vote for directors or officers of the proposed corporation; (b) BIN-NUN shall not have the right to sell or offer for sale the shares of stock to *94 be received by him for a period of three (3) years from the date of closing thereof, except to the Proposed Purchasers, at a price to be negotiated between them; (c) BIN-NUN shall not be entitled to participate in a return of capital upon liquidation, dissolution or contingency until the stockholders who have contributed cash to the capital of the corporation shall have received the return of their capital contributions in full. 5. The parties agree to execute and to deliver to each other upon demand such documents and agreements as may be required to evidence the participation of BIN-NUN in the joint venture in whatever legal form it may take. Feldman, Spitz, and Feldman formed a corporation, Spitzfeld Textile Corporation, hereafter called Spitzfeld, for the purpose of having this corporation acquire all of the outstanding capital stock of the Rose Company held by the estate, 6,080 shares. Feldman, Spitz, and Feldman first entered into a contract dated January 11, 1960, with the estate to purchase all of the shares of stock of the original Rose Company for $760,000. They assigned this contract to the Spitzfeld corporation. It is stipulated that pursuant to this contract, the *95 estate of Rose sold to Spitzfeld the 6,080 shares on February 9, 1960, the date of the closing, for $760,000. The written statement covering the closing of the transaction, provides, inter alia, as follows: The sellers of the shares were the Chemical Bank New York Trust Company, Charles Rose, and Ira Belfer, as the executors; Spitzfeld corporation was the purchaser; the transaction was the sale of 6,080 shares to Spitzfeld, assignee, pursuant to the agreement of January 11, 1960, between the executors and Feldman, Spitz, and Feldman; and the purchase price of the shares was $760,000. The transaction was closed on February 9, 1960, in New York City at Belfer's office. Petitioner was present as the broker. The 6,080 shares were represented by 14 stock certificates numbered 1 through 14, for various numbers of shares. On the date of the closing the purchaser changed its name from Spitzfeld Textile Corporation to Roberts-Rose Textile Co., Inc. (the new Rose Company) and on the same date, the old officers and directors of the original Rose company resigned (those who had been associated with Bernard Rose and the estate of Rose). Under the terms of the contract of sale the purchasers *96 delivered to the sellers at the closing a series of 8 promissory notes in the amount of $6,500 each, in the amount of $52,000, and 1 promissory note in the amount of $8,000, or notes in the total amount of $60,000. Each note was a 30-day note bearing 6 percent interest, with a standard provision to cover a default. One note of $6,500 was to be paid each month for 8 months beginning May 1, 1960; the last note for $8,000 was to be paid on January 2, 1961. The maker of the notes was the new Roberts-Rose Textile Co., Inc., and Spitz, Feldman, and Feldman, were the comakers. Security for the payment of the notes was the stock certificates that were deposited in escrow with Belfer. The purchase price, $760,000, for the 6,080 shares of stock was paid and provided for in the written statement of the closing as follows: Purchase price
$760,000
Credits to purchasers: Deposit on contract
$ 76,000
Installment notes per con-
tract
60,000
Paid at closing
624,000
$760,000
At the closing several documents were delivered in escrow to Belfer, including the 9 promissory notes, and a letter dated February 9, 1960, to Chemical Bank "authorizing the bank to charge the *97 account of Roberts-Rose Textile Co. Inc. at 17th Street & Park Avenue South, New York City for each of the installment notes as the same became due." [1]
Under the agreement between petitioner and the estate of Rose dated December 9, 1959, it was provided that "the commission to be paid in the event that a sale of the said stock results from such negotiations will be the sum equal to five (5%) per cent of the total purchase price paid for the said capital stock." A 5 percent commission on the total purchase price of $760,000 was $38,000. On February 9, 1960, the executors of the estate issued a check to petitioner in the amount of $13,000. Petitioner sent a letter dated February 9, 1960, to Chemical Bank and the other 2 executors of the Rose estate, as follows: I do hereby authorize you to endorse to yourselves a check in the sum of $25,000 representing part of my brokerage commission in connection with the sale by you this day of the capital stock of ROBERTS-ROSE *98 TEXTILE CO. INC., and do hereby acknowledge the receipt of the said sum of $25,000 on account of the said brokerage commission due me. Chemical Bank sent petitioner a letter dated February 11, 1960, in reply, as follows: We acknowledge receipt of your letter of February 9 in which you acknowledge receipt of $25,000. on account of brokerage commission on the sale of the capital stock of Roberts-Rose Textile Co. Inc. and the application thereof as part of the payment on account on behalf of the purchasers. Enclosed is check to your order for $13,000 representing the balance of the commissions due you computed at 5% on the sale price of $760,000. In Chemical Bank's account of the principal in the estate of Rose, credits were made on February 10, 1960, of payments received for the sale of the 6,080 shares of stock of the original Rose Company, as follows: Roberts-Rose Textile Co. Inc. * * *
per letter of 2/9/60 of Aaron Bin-
Nun part of down payment, 6,080
sh. sale
$ 25,000
Roberts-Rose Textile Co. Inc. * * *.
additional down payment, 6,080 sh.
sale
599,000
$624,000 *
Debits were made *99 in the above account for 2 payments to the petitioner, the payment of $25,000 on February 10, 1960, "Payment to Aaron Bin Nun per letter 2/9/60 on a/c brokerage commission", and for the payment on February 11, 1960, of $13,000, "Aaron Bin Nun balance of commission due on sale of Roberts Rose Textile Co. Inc." The following are the entries during February, 1960, in the account for the principal in the Rose estate on the books of the Chemical Bank, Trust Department: Receipts of Principal
Balance of principal
$ 83,106.04
Receipts of principal: Part of down payment per letter
2/9/60 of Bin Nun, Roberts-
Rose Textile Co., 6,080 shs.
25,000.00
Additional down payment, Rob-
erts-Rose Textile Co., 6,080 sh.
599,000.00
$624,000.00
Total
$707,106.04
Disbursements of Principal
Roberts-Rose Textile Co.
6,080 sh. Federal tax
$ 304.00
6,080 sh. New York tax
243.20
Transportation regarding sale
2.25
Rent, 1 month, One Fifth Ave.
Operating Co.
587.34
Payment to Aaron Bin Nun per
letter 2/9/60 on a/c brokerage
commission
25,000.00
Aaron Bin Nun bal. of commission
due on sale of Roberts-Rose Tex-
tile Co.
13,000.00
Expense, meeting on 2/9/60
2.55
$ 39,139.34
Balance of Principal
$667,966.70
*100 Under the agreement of December 22, 1959, between petitioner and Feldman, Spitz, and Feldman it was agreed that petitioner would receive 5 percent of the capital stock of "the corporation which shall hereafter be formed to acquire the said shares of stock of Roberts-Rose Textile Co. Inc." That corporation originally was known as Spitzfeld Textile Corporation. Its capital stock consisted of 200 shares of common stock. The name of this corporation was changed on February 9, 1960, to Roberts-Rose Textile Co., Inc. (the new Rose Company). On February 15, 1960, petitioner received 10 shares (5 percent) of common stock of the Spitzfeld corporation which shares are referred to hereinafter as 10 shares of the capital stock of Roberts-Rose Textile Co., the new Rose Company, but these 10 shares of stock were not part of the 6,080 shares of the capital stock of the original Rose Company that were sold by the Rose estate on February 9, 1960, to Spitzfeld. On December 15, 1961, Fishel Feldman and Leon Spitz purchased from petitioner the 10 shares of common stock of the new Rose Company, originally known as the Spitzfeld corporation, for $26,500; they paid petitioner $23,500 in 1961, and $3,000 *101 in 1962. In his income tax return for 1960, petitioner reported the receipt of only $13,000 in his taxable income, as the commission which he received in 1960 for his services as the broker in the sale of the 6,080 shares of stock. He did not report any additional amount with respect to brokerage commission, or the value of the 10 shares of stock of the Spitzfeld corporation. That is to say, he did not include $25,000 in his income as part of the brokerage commission, or any other amount realized by him in the transaction in 1960. In his income tax return for 1961, the petitioner reported the sale of the 10 shares of stock of the new Roberts-Rose Textile Co. (Spitzfeld), as the sale of a capital asset held for more than 6 months, having a cost of zero; he reported a long-term capital gain of $26,500. The respondent made the following determinations with respect to petitioner's income tax liability for 1960 and 1961: For 1960, he included $25,000 in petitioner's income as income from a commission. For 1961, he made adjustments in the amount of the long-term capital gain from the sale in 1961 of the 10 shares of stock in the new Rose Company. He determined that the 10 shares had *102 a cost basis of $25,000, and that upon the sale thereof for $26,500, petitioner realized a long-term capital gain of $1,500. Respondent's determinations for 1961 resulted in a loss and the determination of an overassessment for 1961. Respondent's explanation in the deficiency notice of his determination for 1960 is: "Commissions [$25,000] received as a finder's fee and simultaneously exchanged for a minority stock interest in Roberts-Rose Textile Co., Inc. [Spitzfeld] previously unreported." Ultimate Findings of Fact As between the petitioner and the executors of the Rose estate, under their agreement of December 9, 1959, the finder's fee and commission of the petitioner was $38,000, 5 percent of $760,000, the amount of the sale price of 6,080 shares of stock of the original Rose Company, which were sold on February 9, 1960, by the Rose estate to the Spitzfeld Textile Corporation (the name of which was changed by Feldman, Spitz, and Feldman to Roberts-Rose Textile Co.). As between the petitioner and the executors of the Rose estate under their agreement, petitioner did not "waive" his "right" to receive the whole sum of $38,000; and upon the consummation of the sale on February 9, 1960, of *103 the 6,080 shares of stock, the petitioner had earned and was entitled to receive from the estate, and the estate was obligated to pay petitioner, a commission of $38,000, and no less. Petitioner, in fact, received from the Rose estate in February, 1960, the total sum of $38,000 in 2 payments of $25,000, and $13,000. He used the $25,000 by paying it over to the executors of the Rose estate on February 9, 1960, to be applied to the purchase price of the 6,080 shares of stock owed by the purchaser thereof, the Spitzfeld corporation, and the $25,000 was applied in part payment of the purchase price. Petitioner entered into an agreement on December 22, 1959, with the individuals, Fishel Feldman, Leon Spitz, and Avram Feldman, whereby he agreed in substance to contribute $25,000 of his commission (under the December 9 agreement with the executors of the Rose estate), to the purchase price of $760,000 for the 6,080 shares of stock of the original Rose Company. In effect, petitioner agreed that Spitzfeld would not have to "contribute" $25,000 to the payment of petitioner's finder's fee, or commission. In consideration for petitioner's agreement with Feldman, Spitz, and Feldman to contribute *104 $25,000 to the purchase price of the 6,080 shares of stock, they agreed that 10 shares of stock of the new Spitzfeld corporation (the new Rose Company), 5 percent of 200 shares, would be issued to petitioner, upon the condition (in substance) that petitioner would not sell those 10 shares of stock to any outsider. The "restrictions" in the agreement of December 22, 1959, were in substance tantamount to such condition. As between petitioner and Feldman, Spitz, and Feldman, the 10 shares of stock of the Spitzfeld corporation had a value of not less than $25,000 in February, 1960. In 1960, petitioner earned and received taxable income in the amount of $25,000, which was in addition to the $13,000, which he included in his income for 1960 in his tax return. His total commission was $38,000; it was earned and received by petitioner in 1960. Opinion We are unable to conclude, as petitioner contends, that he did not earn and receive a finder's fee, or commission, in 1960 in the total sum of $38,000; or that he entered into any agreement whereby the executors of the Rose estate were relieved from the obligation and were not obligated under their contract to pay him the entire commission *105 in the sum of $38,000. Also, we cannot find from the proved facts that the petitioner in fact waived $25,000, part of the commission due him upon the consummation of the sale by the Rose estate of the 6,080 shares of stock of the original Rose Company. The controlling principles of law are those enunciated in , and . The petitioner acknowledged "the receipt of the said sum of $25,000 on account of the said brokerage commission due me" in his letter of February 9, 1960, to the executors of the Rose estate. That letter refers to "a check in the sum of $25,000 representing part of my brokerage commission in connection with the sale by you this day of the capital stock of Roberts-Rose Textile Co. Inc.". Petitioner authorized the executors to endorse the check to themselves. However, upon the whole evidence, it is evident that the meaning of the particular wording employed by petitioner in the letter is not (as petitioner contends) that he "waived" $25,000 of his commission. Rather, the understanding between petitioner and the executors was that the check for that amount would be applied as part *106 of the payment of the sale price of the 6,080 shares of stock of the original Rose Company, and that as such, the executors were "to endorse to yourselves a check in the sum of $25,000". In fact, in the account for the principal held in the Rose estate, on the books of the Chemical Bank, principal was debited $25,000 for payment of that amount to petitioner on account of "brokerage commission"; and, also, principal was credited with $25,000 on the same date as "part of down payment" for the sale of the 6,080 shares which was paid by the purchaser of those shares. Moreover, an officer of the bank's Trust Department, in the letter of February 11, 1960, to petitioner referred to petitioner's letter of February 9 as petitioner's acknowledgment of his "receipt of $25,000 on account of brokerage commission"; and with that letter (for the Rose estate), a check of the executors to petitioner for $13,000 was sent to him, "representing the balance of the commissions due you computed at 5% on the sale price of $760,000." Upon the entire record, and the particular evidence referred to above, we find and conclude that petitioner's commission was $38,000, that he did not waive $25,000 thereof, *107 that he earned and in fact received a commission of $38,000 in 1960 for his services as the broker in the sale of the 6,080 shares; and that in 1960 the executors of the Rose estate were obligated to pay and did pay to petitioner a commission of $38,000, of which $25,000 was applied in Spitzfeld's purchase of the shares, and $13,000 was paid to petitioner. Under the reasoning of the Earl and Horst cases, the $25,000 was earned income of the petitioner and is taxable as income received in 1960. We are unable to find merit in petitioner's contentions that $25,000 was not taxable income for 1960. It was part of the commission to which he became entitled in 1960 for his personal services as the broker who brought about the purchase of the 6,080 shares from the estate. Petitioner could not avoid the income tax for 1960 on this amount of earned income, and he could not shift that income over to a subsequent year for tax purposes. He could not select the year for the taxation of $25,000 by means of purportedly "assigning" it to the Spitzfeld corporation for application on the down payment for the 6,080 shares of stock, or by means of an "anticipatory" arrangement with the individuals, Feldman, *108 Spitz, and Feldman under his agreement with them dated December 22, 1959. In the alternative, petitioner contends that the 10 shares of stock of the Spitzfeld corporation (the new Rose Company) did not have a fair market value in 1960 of $25,000, the shares having been received as the consideration for the assignment to the 3 individuals of a "contingent" fee of $25,000. Even if petitioner's theory could be approved, that the 10 shares were received as consideration for the "assignment" to the 3 individuals of a "contingent" fee, which theory we need not reject or approve in disposing of the issue, petitioner cannot succeed in his general contention that he did not realize taxable income in 1960 of $25,000. The evidence here does not support a finding that the 10 shares of stock of Spitzfeld did not have a value of $25,000 in 1960. For example: Spitzfeld became the owner in 1960 of all of the shares of stock of the original Rose Company for which it paid $760,000. There is no evidence that the assets of the original Rose Company were not worth $760,000 in 1960, or that the 6,080 shares of that corporation were not worth $760,000 in 1960. It must be concluded upon the whole record *109 that the 6,080 shares were worth $760,000 in 1960, and it follows that the shares of stock of Spitzfeld had a value in 1960 that reflected the value then of the assets of Spitzfeld. It follows that the 10 shares of Spitzfeld stock received by petitioner had a value in 1960 of at least $25,000. It is recognized that in the agreement of December 22, 1959, between petitioner and the 3 individuals, restrictions were placed upon the rights exercisable by petitioner with respect to the 10 shares. But the substance of them, and indeed, the chief restriction, was that petitioner could not sell the 10 shares to any outsiders, and could sell them only to the Feldmans and Spitz, for a period of 3 years, at a price to be negotiated by them. The evidence does not establish that such restrictions on the 10 shares, as between petitioner and the 3 individuals, were such that in 1960 the 10 shares did not have any value, and a finding cannot be made that they did not have any value in 1960. It is significant that Spitz and Fishel Feldman agreed in December, 1961 to purchase the 10 shares from petitioner for $26,500, and paid $23,500 on account in 1961, and $3,000 in 1962. While the alternative *110 contention of petitioner is not helpful to him because of failure to prove that the 10 shares, as restricted, did not have a value in 1960 of at least $25,000 (petitioner having relied upon his own testimony, there being none by Spitz and Fishel Feldman or Avram Feldman), we do not reach, and need not decide the merits of, petitioner's alternative contention. In fact, petitioner was paid by the executors of the Rose estate, and he received, $25,000 in 1960, as part of his commission, in addition to the $13,000 of the commission. The $25,000 was earned income in 1960, which petitioner received. It is not material, in determining that petitioner earned and received income of $25,000 in 1960, what petitioner's agreement was with the 3 individuals. Since petitioner reported income on the cash basis, he was required to include the $25,000 in his 1960 income. Respondent's determination is sustained. Decision will be entered for the respondent. Footnotes
1. The estate of Bernard Rose, also had its bank account in the Chemical Bank, account number T 30165, in the Personal Trust Department which had custody of the assets of the estate and maintained its bank account.↩
*. [$624,000 was the total cash payment at the closing.]↩